**Paskel N. WADLEY, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–75–226.**

Court of Criminal Appeals of Oklahoma.

Aug. 5, 1976.

Rehearing Denied Sept. 1, 1976.

Jack B. Sellers, Sapulpa, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Jahn D. Rohrer, Legal Intern, for appellee.

## OPINION

BRETT, Presiding Judge.

Appellant, Paskel N. Wadley, hereinafter referred to as defendant, was charged in Case No. CRF–74–7 of the District Court, Pawnee County with the crime of Murder in the Second Degree in connection with the death of his wife. He was convicted after a trial by jury of the crime of Manslaughter in the First Degree and, in accordance with the verdict of the jury, was sentenced to serve a term of nineteen (19) years in the State penitentiary. He appeals.

At the time of Mrs. Wadley's death, the Wadleys had been married less than a year. They lived in a trailer house in the Edgewater Mobile Home Park in Pawnee County. Mrs. Wadley's 14-year-old daughter from a prior marriage lived with them. It is apparent from the record that their marriage was other than harmonious. On one occasion the violence of their fighting had forced the daughter to intercede by calling the police. There was testimony

that shortly before his wife's death, Wadley had been suspicious about her relationship with another man and angry at the discovery that she maintained a secret and separate bank account.

In the early morning hours of January 29, 1974, Wadley summoned an ambulance to aid his wife. When the ambulance attendant arrived he found Mrs. Wadley dead and immediately notified law enforcement officials of his belief that her death was the result of homicide. Dean Taylor, a Deputy Sheriff of Pawnee County, arrived at the Wadley home at approximately 3:30 a.m. His investigation at the scene revealed blood stains on the living room carpet, and blood-stained bedclothes in the bathtub. Dr. Hickerson, a medical doctor summoned by the police, arrived at the trailer house at approximately 4:15 a. m. He examined the body and formed the opinion that Mrs. Wadley had died an hour and a half to two hours earlier. The doctor testified that he found numerous bruises on the face and upper arms and an abrasion on each knee. The doctor testified that the injuries of the deceased were not inconsistent with the type of injury which results from a fight. The pathologist who performed the autopsy, Dr. Leo Lowbeer, testified that he found numerous abrasions, bruises and scratches on the body. He found blood in the mouth and in the larynx. He testified that Mrs. Wadley died from suffocation caused by heavy bleeding.

The daughter, Vicki Williams, testified that on the evening before her mother's death she was baby-sitting for friends. At approximately 5:30 p.m. her stepfather came for her and insisted that she return home with him. He questioned the girl angrily about her mother's whereabouts and conduct. He told her that he knew her mother was guilty of adultery. At home, the defendant told Vicki she must be quiet because her mother was in bed asleep. Vicki left the trailer again at about 6:30 p.m. and returned about 8:00 p.m. She noticed and inquired about a wet stain on the living room rug next to the coffee table; the defendant told her that her dog was responsible for the stain. The remainder of the evening was unremarkable and she went to bed about 10:00 p.m. and slept until Wadley woke her to tell her than an ambulance was on the way because her mother had taken an overdose of pills. This witness also testified about fights between her mother and Wadley. She had heard them argue loudly and on occasion had heard "somebody hitting somebody." She also testified that she had heard her mother admit to the defendant that she had committed adultery with a Ron Mowry. The defendant took the stand in his own behalf and testified that his wife was capable of violent anger. The previous Thanksgiving they had, as the result of her infidelity, fought violently. On the afternoon of January 28, 1974, he testified, they had another fight for the same reason. Wadley testified that when his wife tried to attack him with a broken water glass, he pushed her away and she fell, striking her head on the coffee table. After her fall she was bleeding heavily from her nose and he helped her to the bedroom. In the bedroom they both fell and she struck her head again, this time on the bedpost. He testified that he asked her if she wanted a doctor and she declined. He put the blood-stained bedding in a bathtub of cold water and left his wife to sleep. When, many hours later, he found that his wife was breathing with great difficulty he called an ambulance. He testified that he had not struck his wife with any weapon or instrument and denied that he had intended to seriously injure her.

■ On appeal he contends first that he was unfairly convicted because the court admitted pretrial hearsay into evidence against him. Secondly, he contends that the court erred in instructing the jury on the lesser included offense of manslaughter in the first degree.

The latter contention is without merit. The gist of his argument in support is that the statute which defines the crime of

murder in the second degree, 21 O.S.Supp. 1973, § 701.2, includes every element of the crime classified as manslaughter in the first degree, and, consequently, operates to repeal the latter statute by implication. It is sufficient to say that the three circumstances defined as murder by Section 701.2 were not newly created by the State Legislature in 1973. The definitions of murder in that statute have been part of the Oklahoma statutory scheme defining grades and types of homicide since statehood. The statute is different only to the extent that certain specific circumstances have been carved from it and elevated to murder in the first degree.

Defendant's remaining contention, that he was denied a fair trial because the trial judge admitted into evidence against him prejudicial hearsay, concerns testimony given by Karen Sisk, a licensed practical nurse at the Cleveland Area Hospital, Dorothy Morton, a registered nurse at the Cleveland Area Hospital, Wilma Brewer, a ward clerk at that hospital, and Vicki Beatty, a patient at that hospital, who shared a room with Mrs. Wadley in November of 1973. Each of these witnesses testified that the deceased had made certain declarations to them about past conduct of the defendant toward her, specifically, that he had beaten her.

In addition, a Robert Williams, the father of Vicki, testified that he visited Mrs. Wadley in the hospital during that same period and observed that she had some hair pulled out and was badly bruised. He testified that the deceased had told him that Wadley had tried to kill her. Williams also testified that he talked to Wadley later that day and that the defendant admitted assaulting his wife stating "I hit her good. . . . I knocked her out of the car." (Tr. 302)

Most of this evidence was inadmissible because it concerned declarations by the deceased which referred to past acts of the defendant.

 It is fully recognized that where hostile emotions at a particular time are to be proved in a case, the existence of the same emotion in the same person at another time is proper evidence. II Wigmore on Evidence, § 396 (3rd ed. 1940). And the conduct, attitude, and feelings of the accused and the deceased toward each other may be shown in a murder case to establish motive, malice or intent. I Wharton's Criminal Evidence § 175. Evidence of prior assaults by the defendant upon the deceased is admissible in such a case even though such evidence constitutes evidence of another crime. II Wigmore on Evidence, § 363 (3rd ed. 1940). This Court has long recognized that rule. See, *Tapedo v. State,* 34 Okl.Cr. 165, 245 P. 897 (1926). Cases such as the one before us now in which the evidence showed instances of previous hostility between a husband and wife are sometimes treated as though they form a group by themselves: "In marital homicide cases any fact of circumstance relating to ill-feeling, ill-treatment, jealousy, prior assaults, personal violence, threats, or any similar conduct or attitude by the husband toward the wife are relevant to show motive and malice in such crimes." *Romero v. People,* 170 Colo. 234, 460 P.2d 784, 788 (1969).

 But while the fact of prior assaults or ill-treatment is clearly a proper matter for proof in a murder case, the manner of that proof must not violate the rules of evidence and the defendant's right to a fair trial. In this case the testimony of the witness Robert Williams that the defendant had told him in November of 1973 that he had hit the deceased is proper evidence. The remaining testimony concerning the deceased's declarations that the defendant had assaulted her was improperly and erroneously admitted into evidence.

The trial judge, over the objection of the defendant, ruled that the testimony relating to the prior assault was admissible for the purpose of showing the state of mind of the deceased toward the defendant and that it was not admitted for the purpose of showing the truth of the matter asserted—the fact of the assault. (Tr. 7–9).

Hearsay is evidence of an out-of-court declarant which is offered to prove the truth of the matter asserted in the declaration. In a homicide case antecedent declarations of the deceased showing his or her then presently existing state of mind are admissible when relevant. If the declaration is offered not to prove the truth of what was said, but to prove the deceased's state of mind toward the defendant the hearsay rule is not encountered, and hence not violated. If, on the other hand, the declaration is a direct statement of the declarer's state of mind such as "I hate X" or "I am afraid of X" the declaration is hearsay, but it is admissible under the state of mind exception to the hearsay rule. The ruling of the trial judge classified the challenged evidence here as technically non-hearsay and admitted it under the former rule.

Courts have long distinguished declarations by the deceased ". . . of intentions, casting light upon the future, . . . from declarations of memory, pointing backwards to the past." *Shepard v. United States,* 290 U.S. 96, 106, 54 S.Ct. 22, 26, 78 L.Ed. 196, 202 (1933). The reason why the line is drawn short of permitting declarations by the deceased concerning past acts of the defendant is not hard to discern. It is stated in *People v. Hamilton,* 50 Cal.App.3d 476, 123 Cal.Rptr. 390, 362 P.2d 473, 481 (1961), in words as applicable to the instant case as they were to Hamilton's:

". . . By these declarations the prosecutor was able to tell the jury, . . . defendant had brutally beaten his [wife], and otherwise assaulted her. In a not very subtle way it told the jury what kind of man it was that was before them on trial. It will not do to say, as does the attorney general, that the jury was told that these declarations were not to be considered for their truthfulness but merely as verbal acts casting light upon [the deceased's] state of mind. It is difficult to believe that even the trained mind of a psychoanalyst could

thus departmentalize itself sufficiently to obey the mandate of the limiting instruction. Certainly a lay mind could not do so. It must be remembered that the theory upon which such evidence is admitted is that the declarations are evidence of the real state of mind of the declarant. The state of mind (fear of defendant) could only reasonably exist, when based not on threats but on conduct of the accused, when the declarations contain a description of the conduct causing that state of mind. In other words, in such cases it must be inferred that the declarant had this mental state of fear only because of the truthfulness of the statements contained in the assertion. In the present case, it must inevitably follow that if the jury believed that [the deceased] was in fear of her life, it was only because defendant had in fact beaten and otherwise assaulted her. Logically, it is impossible to limit the prejudicial and inflammatory effect of this type of hearsay evidence." (Footnote omitted)

And Justice Cardoza said, on the same point, in *Shepard v. United States,* supra:

"Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out. . . ." (Citation omitted) 290 U.S. at 104, 54 S.Ct. at 25, 78 L.Ed.2d at 201–202.

This Court recently considered the issue of the proper admission of antecedent declarations of a deceased person in a homicide case in *Sallee v. State,* Okl.Cr., 544 P.2d 902 (1976). The statement at issue in that case serves as an example of one "casting light upon the future" and properly admitted. The declaration attrib-

uted to the deceased in that case was that she was afraid of her husband and that he had threatened to kill the family "before the year was out." 544 P.2d at 906. In the instant case the trial judge in making his ruling appeared to rely upon the prosecution's citation of *Dandridge v. State,* Okl.Cr., 519 P.2d 529 (1973). The opinion in *Dandridge* fails to point to the specific testimony preserved by objection and challenged on appeal as an inadmissible antecedent declaration by the deceased. To the extent that that opinion states that declarations by the deceased concerning past acts or conduct of the defendant are admissible, it is hereby overruled.

■ The evidence we have discussed was improperly admitted against this defendant. The question is now whether that evidence so tainted the fairness and truth-finding function of his trial as to require the reversal of his conviction. In considering this question we find it significant that the defendant was charged with murder but convicted of the lesser crime of manslaughter in the first degree. The relevant paragraph of 21 O.S., § 711, defines manslaughter in the first degree thus:

> "Homicide is manslaughter in the first degree in the following cases:
>
> \* \* \* \* \* \*
>
> "2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

Having carefully considered the transcript, we are able to say that subtracting the inadmissible evidence from that against this defendant leaves a sufficient abundance of evidence to justify his conviction. A second trial therefore would aid neither the defendant nor the State. We are not able, however, to say with certainty that the inadmissible evidence did not affect the jury's assessment of punishment. We are of the opinion that the instant circum-

stances constitute a proper case for the exercise of our modification power. Accordingly, it is the order of this Court that the sentence imposed upon the defendant of nineteen (19) years in the State penitentiary be modified by being reduced to a term of ten (10) years in the State penitentiary. The judgment appealed from is affirmed; the sentence appealed from is *MODIFIED*; and as modified, *AFFIRMED.*

BUSSEY, and BLISS, JJ., concur.